# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
July 10, 2012 Session

## STATE OF TENNESSEE v. TERRANCE HOLLIDAY

### Appeal from the Criminal Court for Shelby County
No. 10-02254    James M. Lammey, Jr., Judge

### No. W2011-01734-CCA-R3-CD  - Filed February 8, 2013

The defendant, Terrance Holliday, was found guilty of first degree (premeditated) murder of the victim, Michael Woods, and sentenced to life in prison with the possibility of parole.  On appeal, the defendant claims that the evidence is insufficient to support his conviction.  The defendant also claims that the trial court erred by denying his motion to suppress a photographic identification and by denying his motion *in limine* with respect to certain statements made by a deceased co-defendant, which were introduced into evidence though another witness.  After careful review, we conclude that the evidence is sufficient to support the defendant's conviction and that the trial court did not err by denying the defendant's motions.  The judgment of the trial court is affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Charles Mitchell and Lisa Harris, Memphis, Tennessee, for the appellant, Terrance Holliday.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Paul Hagerman and Tracey Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTS AND PROCEDURAL HISTORY

On February 18, 2009, the victim, Mr. Michael Woods, was shot and killed while having dinner in a Chinese restaurant.  Shortly before the shooting, an individual entered the

restaurant and tried to get the victim to come outside to speak with someone. The victim refused. Shortly afterward the killer, wearing a black hooded sweatshirt, fired multiple shots into the victim with a semi-automatic pistol. The first shot came from outside the restaurant, through the restaurant's front door. The remaining shots were taken after the killer entered the restaurant, hitting the victim multiple times in the head and chest. The killer fled the scene.

On April 6, 2010, a Shelby County grand jury indicted the defendant for the first degree murder of the victim. The grand jury also indicted an accomplice, Mr. Randy Farmer, for facilitating the felony. Prior to trial, the defendant moved to suppress an eyewitness identification of him as the shooter made by Mr. Terrance Jackson. At a pretrial hearing on the defendant's motion to suppress, Mr. Jackson testified that he was with the victim on the night that he was killed. Around 7 p.m. that evening, he and the victim went into a local Chinese restaurant, and the victim ordered some French fries. Mr. Jackson visited briefly with an old acquaintance and then joined the victim at a table. Mr. Jackson testified that while they were talking, "a guy came in and asked [the victim] if he would step outside – there was somebody outside that wanted to see him." Mr. Jackson testified that the victim declined the invitation and told "the guy"[1] to tell the individual outside to come inside if he wanted to see him. Mr. Jackson testified that "the guy" appeared puzzled for a moment and then left the store. Mr. Jackson testified that he asked the victim if he should go outside and see who was out there, and the victim said "yeah."

Mr. Jackson went outside and saw "the guy" (who had just come inside the restaurant) talking to the defendant. He testified that he had never seen the defendant before. Mr. Jackson testified that he went up to the defendant and tried to shake his hand, but the defendant claimed that he did not engage in the practice and never took his hands out of his pocket. Mr. Jackson testified that he stood face-to-face with the defendant for some time, and he was able to see the defendant's face clearly although it was dark, because there were lights located underneath the viaduct where the store was located. He testified that he invited the men to come inside the Chinese restaurant, but they would not do so. He testified that he turned around and walked off.

Mr. Jackson testified that the men started walking behind him. He testified that he heard a gunshot, "which caused me to take off running because I didn't know if he shot at me or if he was shooting at anybody else in particular." He stopped some distance up the parking lot, when he realized he was not being shot at and that his brothers and friend were still in the restaurant. Mr. Jackson testified that when he turned around, he saw the defendant shooting the victim repeatedly in the head. Mr. Jackson testified that after shooting the

---

[1] This individual was later identified as Mr. Randy Farmer, the defendant's alleged accomplice.

victim, the defendant left the restaurant and ran away.

Mr. Jackson testified that he spoke with homicide detectives the following day and gave a statement. He testified that he was shown a photographic array of six individuals. He testified that he was shown a legal form before he was shown the array. He testified that he identified the defendant from this photographic array. He testified that the officers asked him if he was sure, because he had previously told them that he had been drinking earlier that day. He testified that he insisted to the officers that he was sure.

Mr. Jackson testified that on February 26, 2009, he was shown a second photographic array by police. He testified that he was not under the influence of drugs or alcohol on this occasion. He testified that he again selected the defendant out of the six-person lineup. He testified that he wrote on the lineup "[u]pon me walking out of the store, I saw this man waiting to see [the victim]. I went down to tell him to come in the store when the guy came in himself and started shooting." Mr. Jackson testified that none of the officers involved in either photographic array ever suggested to him which photograph to select.

On cross-examination, Mr. Jackson vehemently denied that he had been unable to positively identify the defendant as the shooter on February 19, 2009. He testified that the defendant had been wearing a hoodie on the night in question, but he denied that it had been pulled down far enough to cover the defendant's hairline. Mr. Jackson denied that he ran all the way back to his home after the shooting started. Mr. Jackson acknowledged that he did not tell police that the shooter had any distinguishing tattoos or piercings. Mr. Jackson testified that the defendant was the only individual whose picture was contained on both of the photographic arrays that he was shown. Mr. Jackson denied that police officers ever indicated that he had picked the correct individual after he was shown either of the photographic arrays.

At a pretrial hearing held on May 2, 2011, the defendant also challenged a photographic identification made by Mr. Marcus Mull. Mr. Mull testified that he was friends with the victim and was with him on the evening that he was killed. He testified prior to the shooting, he saw the shooter standing outside of a tobacco store about thirty feet away. He testified that he was familiar with the shooter because he had seen him on and off over the last year "where we be hanging, like by the stores and stuff." He testified that he went to go buy some cigarettes, and then he walked back toward the restaurant, getting to within ten feet of the shooter. He starting smoking one of his cigarettes, and then "a young, bright-skinned male came down there and told [the victim that] somebody want [him] outside." Mr. Mull testified that the victim told the individual to tell them to come inside. A few moments later, shots were being fired.

Mr. Mull testified that at the time of the shooting, he was standing outside the Chinese restaurant and could see the shooter. He testified that the shooter walked from the tobacco store to the Chinese restaurant and fired a shot through the door. Then the shooter "opened up the door and shot [the victim] two times in the chest, two times in the head, and [the victim] was dead." Mr. Mull testified that when the firing stopped he ran away, but he eventually turned around and returned to the restaurant, where he discovered the victim dead.

Mr. Mull testified that four or five days after the shooting, the police showed him a photographic array. He testified that he was shown and made to sign a legal form before he was allowed to look at the array. Mr. Mull testified that he recognized the shooter from the photographic array, and he circled the shooter's picture. Mr. Mull testified that the police did not indicate to him whom he should pick out, or otherwise suggest an individual, prior to the time that he made his selection. Mr. Mull identified the shooter as the defendant in open court.

On cross-examination, Mr. Mull acknowledged that when he first described the shooter to police, he did not mention that the shooter had any tattoos or scars on face, and he had stated that the shooter was wearing a skullcap rather than a hoodie. Mr. Mull testified that he had not been drinking or smoking marihuana on the day of the shooting. Mr. Mull also acknowledged that he initially told the police that he wasn't sure whether or not he would be able to identify the shooter because he "didn't get a good look at him."

On re-direct examination, Mr. Mull testified that after the shooting happened, he was afraid for his safety and for the safety of his family. He testified that he did not want to be involved in the police investigation and prosecution. On re-direct, Mr. Mull testified that he wanted to do the right thing after the shooting.

The trial court denied the defendant's motion to suppress, and the defendant's case went to trial. During the State's case-in-chief, Terrance Jackson and Marcus Mull gave eyewitness testimony similar to that given at the pretrial hearings. The State also called some additional eyewitnesses, Sylvia Wiley and Reginald Mull, who testified to the shooting and other events that occurred in the Chinese restaurant on the day in question in a manner consistent with Terrance Jackson and Marcus Mull, but who were unable to positively identify the defendant as the shooter. Officer Jesse McCoy of the Memphis Police Department testified that he was one of the first responders at the crime scene and that he secured the crime scene on the day in question. Officer Sam Blue of the Memphis Police Department testified that he investigated and photographed the crime scene after it was secured, and he discovered six .38 caliber shell casings and two .38 caliber bullets there. He also testified that there was a bullet hole in the front door of the restaurant. Dr. Marco Ross, the medical examiner who performed the victim's autopsy, testified that the victim had a total

of seven gunshot wounds, four of which could have been lethal.

The State also presented the testimony of Mr. Curtis Green, a friend of the defendant's recently-deceased co-defendant, Mr. Randy Farmer.[2] The defendant moved to suppress Mr. Green's testimony concerning certain out-of-court statements made by Mr. Farmer, but the trial court denied the motion. Mr. Green testified that he was with Mr. Farmer on the day of the shooting. He testified that while they were together, Mr. Farmer saw and recognized the victim at a gas station near the Chinese restaurant. Mr. Green testified that after seeing the victim, Mr. Farmer immediately asked him (Mr. Green) to drop him off around the corner. Mr. Green testified that it was getting dark by the time he dropped off Mr. Farmer.

Mr. Green testified that fifteen minutes later, Mr. Farmer called him and asked him to come pick him up quickly. Mr. Green testified that Mr. Farmer was running during this conversation. Mr. Green testified that Mr. Farmer told him that he had participated in a crime. Mr. Green testified that he tried to pick up Mr. Farmer, but he could not locate him. Mr. Green testified that Mr. Farmer called him later in the day to let him know where he was located, and he went to see him. Mr. Green testified that when he arrived, Mr. Farmer again told him that he had participated in a crime that evening before giving him a cell phone and telling him to give that cell phone to the defendant. Mr. Green testified that Mr. Farmer gave him a phone number to call the defendant.

Mr. Green testified that when he talked to the defendant, the defendant indicated that he did not feel good about the situation. The defendant stated that he did not feel good about how things were going to turn out for him. Mr. Green testified that the defendant stated that "he just couldn't let anybody slide like that, because if he left (sic) them slide, then everybody else think that they can just come and take something if they want it." Mr. Green testified that he arrived at the defendant's location, and the defendant came outside. Mr. Green testified that he gave the cell phone to the defendant, and they had some further brief discussion concerning the shooting. The defendant indicated that he was aware that some people had seen him. The defendant indicated that he had acted anyway because he was not going to let the victim "do that and get away with it." Mr. Green testified that he was aware from other sources that the defendant was referring to having been robbed by the victim.

The defendant's jury ultimately returned with a verdict finding the defendant guilty of first degree murder as charged in the indictment, and the trial court sentenced the defendant to life in prison. The defendant filed a timely motion for new trial, which was later amended. The trial court heard and denied the defendant's motion. The defendant filed a

---

[2] The record reflects that Mr. Farmer—the individual who allegedly attempted to lure the victim outside of the Chinese restaurant—was shot and killed in a Krystal's restaurant on July 10, 2010.

timely notice of appeal.  We now proceed to review his claims.

## ANALYSIS

The defendant claims that: (1) the evidence is insufficient to support his conviction; (2) the trial court erred by denying his motion to suppress the photographic identification made by Terrance Jackson; and (3) the trial court erred by failing to suppress the statements made by Mr. Farmer that were introduced in the testimony of Mr. Green.  For the reasons that follow, we find each of these claims to lack merit.  We affirm the judgment of the trial court accordingly.

## I.

The defendant challenges the sufficiency of the evidence used to support his conviction.  Our supreme court recently described the applicable standard of appellate review in detail:

> Appellate courts evaluating the sufficiency of the convicting evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, on appeal a defendant bears the burden of showing why the evidence is insufficient to support the conviction.  *State v. Parker*, 350 S.W.3d 883, 903 (Tenn. 2011).  This Court affords the State the strongest legitimate view of the evidence presented at trial and the reasonable and legitimate inferences that may be drawn from the evidence.  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  "The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact."  *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)).  This Court neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury.  *Bland*, 958 S.W.2d at 659. Circumstantial and direct evidence are reviewed under the same standard of review.  *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt.  *Id.* at 381.

*State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

The defendant in this case was convicted of first degree (premeditated) murder. "First degree murder is . . . [a] premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1) (2009). "Premeditation" means that the defendant formed the intent to kill: (1) "prior to the act itself" (although the defendant need not necessarily have held that intent "for any definite period of time" prior to the act), (2) "after the exercise of reflection and judgment," while (3) "sufficiently free from excitement and passion." T.C.A. § 39-13-202(d). "Premeditation may be proved by circumstantial evidence." *State v. Brooks*, 249 S.W.3d 323, 329 (Tenn. 2008). "Premeditation may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment'. . . ." *State v. Leach*, 148 S.W.3d 42, 53 (Tenn. 2004) (quoting T.C.A. § 39-13-202(d)). A defendant's "threats or declarations of intent to kill" and "use of a deadly weapon upon an unarmed victim" are established factors from which a reasonable jury may infer premeditation. *Id.* at 53-54. So too are a "lack of provocation [on the part of] the victim" as well as a defendant's "failure to provide aid or assistance to the victim, and calmness after the killing." *Brooks*, 249 S.W.3d at 329.

In this case, two eyewitnesses, Terrance Jackson and Marcus Mull, testified that the defendant repeatedly shot the victim in cold blood while he was peaceably eating dinner at a Chinese restaurant. Two other eyewitnesses, Reginald Mull and Sylvia Wiley, corroborated key details of their testimony. The medical examiner testified that the victim was killed by multiple gunshot wounds. Taken together, this evidence suffices to support jury's findings with respect to the essential elements of first degree (premeditated) murder beyond a reasonable doubt. Further, the evidence is sufficient to support the theory that the shooting was done intentionally by the defendant in retaliation for his perceived robbery at the hands of the victim on a prior occasion.

The defendant's primary argument with respect to sufficiency concerns the issue of his identity as the shooter. The defendant acknowledges that issues concerning the credibility of witnesses—including the two eyewitnesses who identified him in his case—are firmly in the domain of the jury. However, he contends nonetheless that their combined testimony was not sufficient to "convince the average mind of the defendant's guilt beyond a reasonable doubt." However, the testimony of the two eyewitnesses on the subject is clear and unambiguous and, if one or both were accredited, the defendant's identity as the shooter was amply established. On appeal, this Court does not re-weigh evidence or substitute its own inferences for those drawn by the jury. *See, e.g., State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). The defendant's claim that the evidence is insufficient to support his conviction for

first degree (premeditated) murder is denied.

## II.

The defendant claims that the trial court erred by denying his motion to suppress Mr. Jackson's identification of him as the shooter. We review a trial court's decision concerning a motion to suppress under the standard established in *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). *See, e.g, State v. Brotherton*, 323 S.W.3d 866 (Tenn. 2010); *R. D. S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008). "[O]ur review of a trial court's application of law to the facts is conducted under a de novo standard of review." *R. D. S.*, 245 S.W.3d at 362. A trial court's factual findings, however, will be upheld so long as the evidence does not preponderate against them. *Odom*, 928 S.W.2d at 23. "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge" and "[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." *Id.*

Both state and federal due process protections guard against a citizen being convicted through the use of unduly suggestive witness identification procedures by the police. *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *Bennett v. State*, 530 S.W.3d 511, 515 (Tenn. 1975). "It is the likelihood of misidentification which violates a defendant's right to due process...." *Biggers*, 409 U.S. at 198. If police utilize an unduly suggestive identification procedure (such as the much-maligned "showup," where a witness is shown only a picture of an individual that the witness is told police suspect of the crime), then a due process violation may have occurred and later identifications made by the witness may be tainted. *Biggers*, 409 U.S. at 196-97. However, "[e]ven if a pretrial confrontation is suggestive, the in-court identification may be reliable and admissible in light of the totality of the circumstances." *State v. Brown*, 795 S.W.2d 689, 695 (Tenn. Crim. App. 1990). In such situations, "each case must be considered on its own facts, and . . . convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons* v. U.S., 390 U.S. 377, 384 (1968). Courts consider multiple factors when evaluating "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199; *see also Bennett*, 530 S.W.2d at 514. These factors include: "the opportunity of the witness to view the criminal

at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200; *see also Brown*, 795 S.W.2d at 694.

The defendant claims that "[t]he first time Jackson was taken into police custody to view the [photo] lineup he was 1) too inebriated to mark his choice and 2) kept by police for 8 or 9 hours." The defendant argues that this initial photographic array was unduly suggestive, and because the defendant was the only individual whose picture also appeared in the second photographic array, the "likelihood of misidentification" in the second photographic array "was ireparable," because "the second identification may have unduly and forever tainted this witnesses (sic) recollection of the first."

However, after reviewing the record, we do not conclude that the first identification procedure was unduly suggestive. Mr. Jackson testified that the police had him read and sign an advice form prior to showing him the photographic array on the date in question. Mr. Jackson testified that police did not suggest to him that any particular individual committed the crime. Mr. Jackson further testified that police never indicated to him afterward whether or not he had identified the "right" individual. There is no contrary evidence appearing anywhere in the record. Consequently, there is no factual basis from which this court might conclude that the police ever utilized an unduly suggestive identification technique.

While Mr. Jackson acknowledged that he had been drinking earlier on the day he was shown the first photographic array, nothing about his decision to drink on the day in question suggests that photographic array was shown to him in any unduly suggestive way. Mr. Jackson testified that he was unaware that he was going to be questioned by police that day until after he had been drinking. His potential intoxication notwithstanding, Mr. Jackson testified that he immediately identified the defendant as the shooter out of the six-person photographic array that was shown to him. There is no evidence appearing in the record concerning why his selection of the defendant from this array was not marked on that day, but there is nothing in the record that establishes, as the defendant asserts, that the witness was too intoxicated to accomplish the task. And even assuming that the record reflected that the earlier procedure was somehow unduly suggestive, we can find nothing in the record that indicates that Mr. Jackson's subsequent marked identification of the defendant was in any way impacted by his identification of the defendant in the first photographic array. The defendant's claim that the trial court erred by denying his motion to suppress Mr. Jackson's identification of him as the shooter is denied.

**III.**

The defendant claims that the trial court erred by denying in part his motion *in limine* #2, which sought to prevent any testimony by Mr. Curtis Green concerning conversations that he had with Mr. Randy Farmer. Specifically, the defendant complains of the admission of Mr. Green's testimony that Mr. Farmer twice admitted to him that he had committed a crime on the day in question. The defendant claims that the admission of these two statements violated his rights under the Confrontation Clause. We disagree.

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. Likewise, the Constitution of Tennessee provides "[t]hat in all criminal prosecutions, the accused hath the right . . . to meet the witnesses face to face. . . ." TENN. CONST. Art. I, § 9. "[T]he principal evil at which the Confrontation Clause [i]s directed [i]s the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Crawford v. Washington*, 541 U.S. 36, 50 (2004). "[E]ven if the Sixth Amendment is not solely concerned with testimonial hearsay, that is its primary object, and interrogations by law enforcement officers fall squarely within that class." *Id.* at 53. As a consequence, "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." *Id.* at 68-69. However, the United States Supreme Court had concluded that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* at 68.

The particular statements challenged by the defendant were not made to law enforcement officials, and therefore they are not "testimonial" in the constitutional sense. With respect to nontestimonial hearsay, such as the statements at issue here, Tennessee has retained its traditional test for determining whether the Confrontation Clause bars the admission of any particular out-of-court statement. "Historically, the Confrontation Clause has not barred the admission into evidence of a statement that 'falls within a firmly rooted hearsay exception.'" *State v. Alley*, 968 S.W.2d 314, 317 (Tenn. Crim. App. 1997) (quoting *Ohio v. Roberts*, 448 U.S. 56, 66 (1980)). Both federal and state courts have held that the hearsay exception concerning statements of co-conspirators is firmly enough rooted in existing jurisprudence that "a court need not independently inquire into the reliability of such statements." *Id.* (quoting *Bourjaily v. United States*, 483 U.S. 171, 183 (1987)). Instead, courts will "allow the admission of co-conspirator statements in criminal cases, viewing sufficient reliability to exist when a preponderance of the evidence shows that the conspiracy exists and that the statement was made by a co-conspirator during the course of and in furtherance of that conspiracy." *Id.*

Those requirements are satisfied in this case. The State established by a

preponderance of evidence that a conspiracy to murder the victim existed between Mr. Farmer and the defendant. There is considerable testimony in the record, including testimony from Mr. Terrance Jackson and other eyewitnesses, that the defendant had an accomplice who attempted to lure the victim out of the restaurant prior to the shooting. Mr. Green also testified that—at Mr. Farmer's request—he secretly dropped Mr. Farmer off near the crime scene immediately after Mr. Farmer saw that the victim was nearby. Mr. Green testified that Mr. Farmer called him fifteen minutes later and, while running, requested that he come pick him up immediately because he had just committed a crime. Mr. Green testified that afterward Mr. Farmer requested his assistance in transporting a cell phone to the defendant, and that during this process the defendant made several inculpatory statements concerning his own involvement the shooting. Taken together, this testimony suffices to establish by a preponderance of the evidence that a conspiracy to murder the victim existed between Mr. Farmer and the defendant.

The record also supports a conclusion by the preponderance of the evidence that the statements at issue were made during the pendency of, and in furtherance of, this conspiracy. This court has long noted that:

> [A] statement may be in furtherance of the conspiracy in countless ways. Examples include statements designed to get the scheme started, develop plans, arrange for things to be done to accomplish the goal, update other conspirators on the progress, deal with arising problems, and provide information relevant to the project. While such statements are ordinarily made to other conspirators [the rules of evidence do] not so require. Statements to third parties may qualify if in furtherance of the conspiracy.

*State v. Carruthers*, 35 S.W.3d 516, 556 (Tenn. 2000) (quoting Tennessee Law of Evidence, § 803(1.2). 6, p. 522). The statements made by Mr. Farmer at issue in this case were made in the course of attempting to (1) flee the scene, (2) update his conspirator on the progress of the conspiracy, and (3) deal with arising problems: namely, avoiding identification and apprehension if possible.

Mr. Green testified that Mr. Farmer's initial statement that he had participated in a crime was made during a phone call that was placed while he was seeking Mr. Green's assistance in fleeing the scene of the crime. Mr. Farmer's second statement to the effect that he had participated in a crime was made during a conversation with Mr. Green in which Mr. Farmer was seeking Mr. Green's assistance in sending a cell phone to the defendant. Whether the purpose of sending this cell phone to the defendant was to assist Mr. Farmer in communicating with the defendant to update him on the status of the crime, or whether it was

simply to tie up a "loose end" that might otherwise tie the two of them to each other and to the murder, in either case, the statement was made during the pendency of the ongoing conspiracy between the two.

As the statements at issue were made during and in furtherance of the conspiracy between Mr. Farmer and the defendant, they were properly admitted by the trial court. The defendant's claim that the trial court erred by denying his motion *in limine* with respect to these statements is denied.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JOHN EVERETT WILLIAMS, JUDGE